OPINION *Page 2 
{¶ 1} Defendant-appellant Ramon V. Banez appeals the June 26, 2006 Judgment Entry of the Stark County Court of Common Pleas, Domestic Relations Division. Plaintiff-appellee is Leticia V. Banez.
 STATEMENT OF THE CASE AND FACTS {¶ 2} Appellee initiated this action by filing a complaint for divorce on April 26, 2004. The parties were married on August 6, 1981. both parties had been married previously, with emancipated children from the prior marriages.
 {¶ 3} In March of 2004, Sherry Dibble of the Stark County Adult Protective Services, along with law enforcement officers, visited the marital residence after contact from Appellee's daughter. The visit resulted in Appellee being transported to a crisis center. Appellee eventually went to live with her daughter. Appellee stated living separate and part for one year as the grounds for the divorce.
 {¶ 4} On July 18, 2005, upon petition of Appellant to be appointed guardian of Appellee in a separate proceeding before the Cuyahoga County Probate Court, that court declared Appellee incompetent. The Probate court appointed Appellee's daughter guardian of Appellee's person, and Attorney Elizabeth Goodwin guardian of Appellee's estate.
 {¶ 5} Following the Cuyahoga County Probate Court's declaration of incompetency, Appellant filed a motion to dismiss Appellee's complaint for divorce for failure to file neither a suggestion of incompetence pursuant to Civil Rule 25(E), nor a substitution of party for the incompetent person as required by Civil Rule 25(B). The *Page 3 
trial court ultimately overruled the motion to dismiss, substituting the guardian of the estate as party plaintiff.
 {¶ 6} On June 26, 2006, via Judgment Entry, the trial court granted Appellee's complaint for divorce, and ordered the division of the marital property.
 {¶ 7} Appellant now appeals, assigning as error:
 {¶ 8} "I. THE TRIAL COURT ERRED IN GRANTING A DIVORCE, BECAUSE THE PLAINTIFF FAILED TO ESTABLISH GROUNDS FOR DIVORCE, DUE TO HER INCOMPETENCE TO TESTIFY.
 {¶ 9} "II. THE TRIAL COURT ERRED IN NOT DISMISSING THE CASE FOR PLAINTIFF'S FAILURE TO COMPLY WITH CIVIL RULE 25(E), AS ORDERED BY THE MAGISTRATE.
 {¶ 10} "III. THE TRIAL COURT ERRED BY FAILING TO DISTINGUISH MARITAL AND SEPARATE PROPERTY.
 {¶ 11} "IV. THE TRIAL COURT ERRED IN ITS DIVISION OF THE APPELLANT'S PENSION.
 {¶ 12} "V. THE TRIAL COURT ERRED IN NOT ACCOUNTING FOR THE COURT ORDERED PAYMENTS OF ATTORNEY FEES MADE BY APPELLANT DURING THE PENDENCY OF THE CASE.
 {¶ 13} "VI. THE TRIAL COURT ERRED IN AWARDING SPOUSAL SUPPORT TO APPELLEE." *Page 4 
 I. {¶ 14} In the first assignment of error, Appellant asserts the trial court erred in granting the divorce, as Appellee failed to establish grounds for the divorce due to her incompetence.
 {¶ 15} As set forth in the statement of the facts and case above, on July 18, 2005, the Cuyahoga County Probate Court declared Appellee an incompetent person, and appointed a guardian of her person and guardian of her estate following Appellant's petition for guardianship. The court ordered a psychiatric evaluation of Appellee performed by Dr. Patrick Carey. On July 2, 2005, Dr. Carey diagnosed Appellee with Alzheimer's disease of moderate severity.
 {¶ 16} The appointment of a guardian for a mentally incompetent person will not abate a divorce action instituted prior to the incompetence.Heskett v. Heskett (Nov. 25, 1991), Champaign Co. App. No. 91-CA-05.
 {¶ 17} Evidence Rule 601 states:
 {¶ 18} "Every person is competent to be a witness except:
 {¶ 19} "(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 20} The trial court is in the best position to determine the competency of witnesses and is afforded considerable discretion in such matters. State v. Uhler (1992), 80 Ohio App.3d 113, 118, citingState v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of the syllabus. See, also, State v. Wilson (1952), 156 Ohio St. 525. Absent an *Page 5 
abuse of discretion, the competency determinations of the trial court will not be disturbed on appeal. State v. Frazier (1991),61 Ohio St.3d 247, 251.
 {¶ 21} Even where a witness has been committed to a mental facility, that commitment does not automatically render that witness incompetent to testify if he or she has sufficient understanding to comprehend the obligation of an oath and is capable of giving a correct account of the matters seen or heard in reference to questions at issue, notwithstanding some unsoundness of mind. State v. Bradley (1989),42 Ohio St.3d 136, 140; State v. Wildman (1945), 145 Ohio St. 379, 386. Indeed, some unsoundness of mind does not render a witness incompetent if the witness otherwise possesses the three basic abilities required for competency: the ability to accurately observe, recollect, and communicate that which goes on around him or her. Id. at 379.
 {¶ 22} The following exchange occurred at trial during the testimony of Appellee:
 {¶ 23} "Q. Okay. And do you understand why you're here today?
 {¶ 24} "A. (no audible answer).
 {¶ 25} "Q. Why?
 {¶ 26} "A. Because I like to live peacefully.
 {¶ 27} "Q. Live peacefully away from your husband, or with your husband — what do you mean?
 {¶ 28} "A. (no audible answer).
 {¶ 29} "Q. You understand that you're supposed to tell the truth?
 {¶ 30} "A. Uh huh (yes).
 {¶ 31} "Q. Okay. Do you understand what telling the truth means — is that yes?
 {¶ 32} "A. Yes. *Page 6 
 {¶ 33} "Q. Do you want to get divorced from your husband?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. Why?
 {¶ 36} "A. (no audible answer).
 {¶ 37} "Q. Leticia, do you want to get divorced from your husband?
 {¶ 38} "A. Yes.
 {¶ 39} "Q. Why, you need to tell me why, tell the Judge why.
 {¶ 40} "A. (no audible answer).
 {¶ 41} "Q. It's okay for you to answer the question, why don't you tell the Judge, look at the Judge and tell the Judge why you want a divorce.
 {¶ 42} "A. (inaudible).
 {¶ 43} "By the Court:
 {¶ 44} "Q. You'd like to get divorced because he's so mean to you, is that what you said?
 {¶ 45} "A. (no audible answer).
 {¶ 46} "Q. Can you tell me some of the things that have happened?
 {¶ 47} "A. Yes.
 {¶ 48} "Q. Tell me some of the things that have happened where he's been mean?
 {¶ 49} "A. He start hurting me.
 {¶ 50} "Q. He hurts you?
 {¶ 51} "By Ms. Perlman: Your Honor, I can't hear her.
 {¶ 52} "By the Court: Well, come up. — Okay. You mean he hurt you? *Page 7 
 {¶ 53} "A. (un huh) yes.
 {¶ 54} "Q. How did that happen?
 {¶ 55} "A. When I went to our house and, because I'm living with my daughter and he start hurting me.
 {¶ 56} "Q. Physically hurting you? — How. Can you tell me what happened?
 {¶ 57} "A. I was living, — well I was living with my daughter and I went there for awhile in our house, because I live in Strongsville with my daughter and he lives in Canton.
 {¶ 58} "Q. Right. So you went, after you had been with your daughter for awhile you went back to his house, to where you lived with him?
 {¶ 59} "A. Yes.
 {¶ 60} "Q. Did you stay there for awhile then?
 {¶ 61} "A. Yes.
 {¶ 62} "Q. What happened when you were there?
 {¶ 63} "A. Well, I was there only for about three days.
 {¶ 64} "Q. Okay, about three days. What happened during those three days?
 {¶ 65} "A. I was lying down and I was dizzy and . . .
 {¶ 66} "Q. You were lying down because you were dizzy?
 {¶ 67} "A. Yes.
 {¶ 68} "Q. Okay, and then what happened?
 {¶ 69} "A. I went down the stairs.
 {¶ 70} "Q. Okay, you walked downstairs? — Okay. And then what happened?
 {¶ 71} "A. He pushed me. *Page 8 
 {¶ 72} "Q. He pushed you — from behind or in front?
 {¶ 73} "A. From behind.
 {¶ 74} "Q. From behind. While you were going down the stairs, he pushed you from behind, and then what happened, did you fall or not?
 {¶ 75} "A. No, I did it myself.
 {¶ 76} "Q. You grabbed, you held yourself up, you grabbed something, you didn't fall, but he pushed you. Okay. Did anything else happen?
 {¶ 77} "A. I just stand up and went, I walk out.
 {¶ 78} "Q. You walked out of the house.
 {¶ 79} "A. No, in the, in the court it's like a court.
 {¶ 80} "Q. Court yard, like — at the house?
 {¶ 81} "A. Uh huh (yes).
 {¶ 82} "Q. Was it outside.
 {¶ 83} "A. Yes.
 {¶ 84} "Q. Okay. So the stairs you were going down when he pushed you was outside of the house?
 {¶ 85} "A. No, it's not, it's not — it's not the house.
 {¶ 86} "Q. Oh, it's not the house.
 {¶ 87} "A. Oh, yeah, it's in the house, it's at the house, okay.
 {¶ 88} "Q. Okay.
 {¶ 89} "A. It was evening.
 {¶ 90} "Q. Evening. Okay.
 {¶ 91} "A. Yes. I run to my neighbor. *Page 9 
 {¶ 92} "Q. You went to your neighbor's house?
 {¶ 93} "A. Yeah.
 {¶ 94} "Q. Okay, did you tell them what happened?
 {¶ 95} "A. Yes.
 {¶ 96} "Q. Okay.
 {¶ 97} "A. They call the police.
 {¶ 98} "Q. Okay.
 {¶ 99} "A. They put him in prison. And then the next day he's back to me.
 {¶ 100} "Q. Okay.
 {¶ 101} "A. In the house.
 {¶ 102} "Q. Okay.
 {¶ 103} "A. Because the policeman took him to prison. But I have a hard time.
 {¶ 104} "By Ms. Smithern:
 {¶ 105} "Q. Leticia, do you remember, do you know who Sherry Dibble (sp?)?
 {¶ 106} "A. Yes, I know her.
 {¶ 107} "Q. Who is Sherry Dibble?
 {¶ 108} "A. She's the one who helped me.
 {¶ 109} "Q. Helped you what?
 {¶ 110} "A. When I moved to, she took me to the shelter home.
 {¶ 111} "Q. Sherry took you to the shelter.
 {¶ 112} "A. Yes.
 {¶ 113} "Q. Is that what you said?
 {¶ 114} "A. Yes. *Page 10 
 {¶ 115} "Q. And did Sherry come to your house?
 {¶ 116} "A. Yes.
 {¶ 117} "Q. Okay.
 {¶ 118} "A. Yes, she took me.
 {¶ 119} "Q. Okay, and did you go voluntarily with Sherry?
 {¶ 120} "A. No, I — I don't know that he's coming, but he knows what happened to me, that's why he like to (unintelligible) with her.
 {¶ 121} "Q. I guess I didn't understand. Sherry came to the house, right?
 {¶ 122} "A. Uh huh (yes).
 {¶ 123} "Q. And you went with Serry [sic].
 {¶ 124} "A. Yeah.
 {¶ 125} "Q. Where did Sherry take you?
 {¶ 126} "A. To the nursing home. And it's far, you know.
 {¶ 127} "Q. Did you want to go with Sherry?
 {¶ 128} "A. Yeah, I did. I like to go with her.
 {¶ 129} `Q. And once you went with Sherry, then you went to Lilabeth's house, is that what happened?
 {¶ 130} "A. No, I — I already went to Lilabeth.
 {¶ 131} "Q. You want to go back to live with your husband, Ramone?
 {¶ 132} "A. No.
 {¶ 133} "Q. Why not?
 {¶ 134} "A. I — *Page 11 
 {¶ 135} "Q. You can turn and look at the Judge and answer the question to the Judge. The question was, did you want to go back to live with your husband Ramone?
 {¶ 136} "A. No.
 {¶ 137} "Q. Are you afraid of your husband?
 {¶ 138} "A. Yes.
 {¶ 139} "Q. And why are you afraid of your husband? — You can look at the Judge and answer to the Judge.
 {¶ 140} "By the Court: Are you afraid of Ramone?
 {¶ 141} "A. Yes.
 {¶ 142} "By the Court: Why? Can you tell me why?
 {¶ 143} "A. (no audible answer)
 {¶ 144} "By the Court: You told me about him pushing you, have there been other cases, other times when he's hurt you, or tried to hurt you?
 {¶ 145} "A. He tried to hurt me, he push me and I ran to our neighbor —
 {¶ 146} "By the Court: Uh huh (yes).
 {¶ 147} "A. (unintelligible) and my neighbor live beside our house, their house and our house are very close, so my neighbor took me and paramedic lay on my sofa, `cause she saw the blood and I had cut here.
 {¶ 148} "* * *
 {¶ 149} "Q. Leticia, is anybody forcing you to come in today to tell the Judge that you want to get divorced?
 {¶ 150} "A. No, I'm the one who like the divorce.
 {¶ 151} "Q. So you're doing this voluntarily of your own free will? *Page 12 
 {¶ 152} "A. Yes.
 {¶ 153} "Q. Correct?
 {¶ 154} "A. Yes.
 {¶ 155} "Q. Okay.
 {¶ 156} "* * *
 {¶ 157} "A. Because I like to — I like to —
 {¶ 158} "By the Court: This is the court, you remember that.
 {¶ 159} "A. Yes.
 {¶ 160} "By the Court: Okay, and do you know why you're here?
 {¶ 161} "A. Yes.
 {¶ 162} "By the Court: Why?
 {¶ 163} "A. I like to buy a divorce.
 {¶ 164} "By the Court: You want to get divorce, is that what you said?
 {¶ 165} "A. (no audible answer).
 {¶ 166} "By the Court: Okay. You're sure that's what you want to do?
 {¶ 167} "A. (no audible answer).
 {¶ 168} "By the Court: You're saying, yes, is that right?
 {¶ 169} "A. Yes.
 {¶ 170} "By the Court: You don't want to be married to Ramone?
 {¶ 171} "A. No.
 {¶ 172} "By the Court: Are you sure about that?
 {¶ 173} "A. (no audible answer)."
 {¶ 174} "By the Court: You're sure. Okay." *Page 13 
 {¶ 175} Tr. at 7-14; 30-31.
 {¶ 176} The trial court's June 26, 2006 Judgment Entry states:
 {¶ 177} "Despite the Cuyahoga County adjudication of incompetency, the Court finds that, on the day of her testimony, she was lucid and competent to testify and express her desire with regard to the divorce proceedings. This Court, after 1½ days of testimony on grounds, finds that Wife has been voluntarily living separate and apart from Husband for more than one year. During Wife's testimony, she appeared at times to have difficulty remembering details regarding the date of her marriage and her Husband's occupation. However, when directly asked about her desires regarding the divorce, Wife stated she wanted the divorce. She said she was not being forced, and she was making the decision of her own free will. She stated that she wanted "to live peacefully" and did not wish to return to live with Husband. She said she was afraid of him, and her demeanor in the courtroom bolstered this assertion. Wife had previously filed for divorce in 1986. During her testimony there was no indication that Wife had changed her mind regarding following through with this divorce."
 {¶ 178} Based upon our review of the record and the case law set forth above, the trial court did not abuse its discretion in determining Appellee competent to testify at trial. The trial court was in the best position to observe the witness and assess her credibility and propensity to competently testify. Although Appellee at times struggled to communicate due to her difficulty with the English language, and at times seemed confused, she demonstrated she was able to communicate and recollect her living apart from her husband due to her fear of him.
 {¶ 179} The first assignment of error is overruled. *Page 14 
 II. {¶ 180} In the second assignment of error, Appellant asserts the trial court erred in not dismissing this action based upon Appellee's failure to comply with Civil Rule 25(E).
 {¶ 181} The rule provides:
 {¶ 182} "(E) Suggestion of death or incompetency
 {¶ 183} "Upon the death or incompetency of a party it shall be the duty of the attorney of record for that party to suggest such fact upon the record within fourteen days after he acquires actual knowledge of the death or incompetency of that party. The suggestion of death or incompetency shall be served on all other parties as provided in Rule 5."
 {¶ 184} The time for filing a suggestion of death or incompetency may be extended after its expiration upon a showing of excusable neglect.Markan v. Sawchyn (1987), 36 Ohio App.3d 136, 521 N.E.2d 824. Whether a party has demonstrated excusable neglect is within the discretion of the trial court and is to be decided upon the facts of each individual case.Id.
 {¶ 185} On September 14, 2005, the trial court conducted a hearing relative to Appellee's motion to substitute a party and Appellant's motion to dismiss, both motions being filed on September 12, 2005. The Magistrate recommended the court sustain Appellant's motion to dismiss. At the hearing, the following exchange occurred:
 {¶ 186} "By Ms. Smithern: Thank you, your Honor. On behalf of the Plaintiff Leticia Banez, your Honor, on July 18th of 2005, Carmen Lilabeth is seated at the table to the left who is Leticia's daughter was appointed in Probate Court as the Guardian of the person. On July 26th, 2005, Attorney Elizabeth Goodwin was appointed Guardian of *Page 15 
the estate by the Probate court and the issue in Probate Court and the issue in Probate Court was somewhat extended and quite frnakly [sic] I think up until Saturday, last Saturday, I was actually unaware thatLilabeth had been appointed the Guardian of the person at which point assoon as I became aware which was Saturday afternoon, that's when I filedthe motion to substitute. I filed the motion to substitute both Lilabethand that's who's referred to as Lilabeth instead of, her actual name isCarmen, as well as Attorney Goodwin to the Guardian of the person andthe estate, and under Rule 25 for substitutions of parties paragraph(B), if the parties are judged incompetent the Court upon motion servedshall allow the action to be conceived buyer against [sic-"continued by or against"] its representative. It's a mandatory obligation on the Court to allow the substitution to occur, the Civil Rule does not say, may, it is not discretionary with the Court, the Court must under the Civil Rule substitute the appropriate party so that the action can proceed as the real parties, so these two Guardians can proceed as the real party in interest on behalf of (inaudible) adjudicated incompetent.
 {¶ 187} "* * *
 {¶ 188} "By Ms. Perlman: Thank you, Your honor. First of all I'd liketo say that I first became aware that Lilabeth was appointed Guardian ofthe person late Saturday evening during a phone conversation withAttorney Goodwin. My understanding is that when the hearings were held, and we're talking about the Cuyahoga County Probate Court, when the hearing was held in that court, which I believe was July 18th, 2005, that the Probate Court indicated that Miss — that Lilabeth would be appointed the Guardian of the person and that a non-family member would be appointed as the Guardian of the *Page 16 
estate, and of course that's exactly what happened, with Miss Goodwin being a Cuyahoga County attorney being appointed as Guardian of the estate."
 {¶ 189} Tr. at 4-6. (Emphasis added.)
 {¶ 190} Appellee filed objections to the Magistrate's recommendation, and the trial court conducted a hearing. This Court has not been provided with a transcript of the proceedings before the court on hearing Appellee's objections; therefore, we presume the regularity of the proceedings. Furthermore, based upon the exchange at the hearing before the magistrate set forth above and our disposition of the first assignment of error, we find the trial court's granting Appellee's motion to substitute the party did not cause prejudice to Appellant, and Appellee demonstrated excusable neglect for filing a late suggestion of incompetency. We note it was Appellant himself who initiated the suggestion of incompetency proceeding.
 {¶ 191} The second assignment of error is overruled.
 III. {¶ 192} In the third assignment of error, Appellant argues the trial court erred in the distribution of the parties' marital property.
 {¶ 193} First, Appellant argues the trial court failed to determine property he owned prior to the marriage remained separate property. Specifically, Appellant testified at trial he owned real property on the date of the marriage, free of any mortgage.
 {¶ 194} Appellant asserts the trial court should have found the real estate remained his separate property.
 {¶ 195} R.C. Section 3105.171(A) states: *Page 17 
 {¶ 196} "(6)(a) "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
 {¶ 197} "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
 {¶ 198} "* * *
 {¶ 199} "(v) Any real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement;
 {¶ 200} "* * *
 {¶ 201} "(b) The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."
 {¶ 202} The party seeking to establish an asset as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property. Swaney v. Swaney 2003-Ohio-4641. The presumption is the property is marital unless proven otherwise by a preponderance of the evidence. A factual finding of the trial court will be reversed only if it is found to be against the manifest weight of the evidence. Judgments supported by some competent, credible evidence will not be reversed as against the manifest weight of the evidence.Mclendon v. Mclendon (Dec. 2, 1999) Muskingum App. No. CT99-0003.
 {¶ 203} The following exchange occurred at trial:
 {¶ 204} "Q. Okay. Now you had ownership of the home on Cornwall at the time of your marriage, correct?
 {¶ 205} "A. Yes, maam. *Page 18 
 {¶ 206} "Q. And that house on Cornwell [sic] did not have a mortgage, correct?
 {¶ 207} "A. No, maam.
 {¶ 208} "Q. That is correct? — No mortgage.
 {¶ 209} "A. No mortgage.
 {¶ 210} "Q. Okay. And let's go through what happened with the real estate as the years went by.
 {¶ 211} "A. Way back until —
 {¶ 212} "Q. Well, I'm going to show you papers and you can tell me what they are. I'm going to show you what's marked as Defendant's Exhibit "NN" and ask you if this is the closing statement for when you originally purchased the house on Cornwall?
 {¶ 213} "A. Yes, maam.
 {¶ 214} "Q. Okay. And that home was purchased in what year?
 {¶ 215} "A. 1980, — June 12, 1980.
 {¶ 216} "* * *
 {¶ 217} "Q. Okay. If you could turn to page two, does that represent a sale of Cornwall?
 {¶ 218} "A. Yes, maam.
 {¶ 219} "Q. And was that the closing statement from the sale of Cornwall?
 {¶ 220} "A.Yes, maam.
 {¶ 221} "Q. When was that sale of Cornwall closed?
 {¶ 222} "A. I think it was in 1992 — `93 — it should be here — I cannot find — there's no date here.
 {¶ 223} "Q. Right here. *Page 19 
 {¶ 224} "A. Okay, okay, December 3, 1993.
 {¶ 225} "Q. Okay, and what was the sale price of Cornwall?
 {¶ 226} "A. 157,500.
 {¶ 227} Q. Okay, would you turn to the next page, please. And does this represent the closing statement for the purchase of the property on St. Edmond Avenue (sp).
 {¶ 228} "A. Yes, maam.
 {¶ 229} "Q. And what was the purchase price of the property on St. Edmond Avenue?
 {¶ 230} "A. 169,720.
 {¶ 231} "Q. What was the date of that purchase?
 {¶ 232} "A. February 24, 1993.
 {¶ 233} "Q. And so that was right before you sold the house on Cornwall?
 {¶ 234} "A. Yes, maam.
 {¶ 235} "Q. So what happened money wise as far as the money that you used to purchase St. Edmonds and the money that you received from the sale of Cornwall?
 {¶ 236} "A. From the sales of Cornwall?
 {¶ 237} "Q. Yes, can you explain how that worked?
 {¶ 238} "A. From the sales of Cornwall I deposited it until I could purchase this other one, until the date is, I think, I have to deposit it and put it in some of the funds.
 {¶ 239} "Q. Can you turn to the next page, please. Does this next page represent the closing statement from when Cornwall was sold — not Cornwall, I'm sorry, St. Edmonds was sold? *Page 20 
 {¶ 240} "A. Yes, maam.
 {¶ 241} "Q. And what was the date of the sale?
 {¶ 242} "A. November 14, 2003.
 {¶ 243} "Q. Okay, what was the sale price of the house on St. Edmonds?
 {¶ 244} "A. That's the settlement or the cash that we received?
 {¶ 245} "Q. No, the sale price.
 {¶ 246} "A. 217,600.
 {¶ 247} "Q. And could you turn to the very next page, please. And is that the closing statement from when you purchased the property on Arbor Creek
 {¶ 248} "A. Yes, maam.
 {¶ 249} "Q. What was the purchase price of the property on Arbor Creek?
 {¶ 250} "A. 184,900.
 {¶ 251} "Q. Okay, and the house on Arbor Creek was actually purchased before you sold the property on St. Edmonds, correct?
 {¶ 252} "A. Ahh, this was purchased and we sold — well the final thing we paid a downpayment for two or 3,000 to start with before that because they build the house, so this one is in the closing. — We made a deposit of 3,000."
 {¶ 253} Tr. at 561-564.
 {¶ 254} The testimony set forth above demonstrates the Appellant's original separate residence was sold, the funds deposited into a joint account and the parties purchased another home. The monies from the sale of the first home were deposited in an undisclosed account prior to the purchase of the second home. Appellant did not introduce evidence to demonstrate the funds were not commingled and were earmarked *Page 21 
separately for down payment on the marital home. Nor did Appellant demonstrate the equity in the home remained constant and separate during the pendency of the marriage. The second home was then sold, the funds deposited into a joint account and the current marital residence on Arbor Creek was purchased. Appellant himself testified some joint marital funds were used in purchasing the property, and again did not demonstrate the funds were not commingled and the equity remained separate property.
 {¶ 255} As Appellant has not demonstrated the assets from the original property are traceable, and have not been commingled and the trial court did not find Appellant's testimony sufficient to demonstrate traceability, the judgment of the trial court is supported by competent, credible evidence, and will not be disturbed by this Court.
 {¶ 256} Second, Appellant argues he owned annuities and life insurance prior to his marriage, which remained separate property.
 {¶ 257} Upon review of the record, Appellant stated when a policy matured; he rolled it over into a different policy. He testified he never withdrew any funds from an annuity, nor did he add funds.
 {¶ 258} The following exchange occurred at trial:
 {¶ 259} "Q. Then let's go to the, you have a Lincoln Financial Group annuity account number 985988814, is that correct?
 {¶ 260} "A. Yes, I have that.
 {¶ 261} "Q. Referring to Plainitff's Exhibit "17B", is this a copy of the quarterly statement for this annuity, through March 31st of 2005, showing a value of $232,271.00?
 {¶ 262} "A. Correct, maam. *Page 22 
 {¶ 263} "Q. And does it likewise show that total contributions to date are $136,666.00? — Yes, or no?
 {¶ 264} "A. The contribution like I told you was transferred, yes, but it was not me that did it, I did not put any money there. I had first New England, then the advisor says, when it matures, transfer to Capital, I agree and then when that mature they say transfer to Lincoln, yes I did agree, then this was actually transferred to USD, I agree every maturity, and I have not removed one cent and it has accumulated from time to time.
 {¶ 265} "Q. Okay, and the contract effective date for this annuity was January 16th, 1995, is that correct?
 {¶ 266} "A. That is correct, when it went into this particular one.
 {¶ 267} "Q. So this annuity was opened during the marriage, is that correct?
 {¶ 268} "A. I do not know whether to call it open, because it was transferred from another one.
 {¶ 269} "Q. Okay, well do you have documents to show the transfers since 1981-since 1981?
 {¶ 270} "A. I was able to get some, I don't have the old old ones anymore, but I have been with them and I have not withdrawn one cent from any of my annuities.
 {¶ 271} "Q. Okay, but you've added to, you've added, you've made contributions in addition to increase —
 {¶ 272} "A. No contributions from my finance except the transfers.
 {¶ 273} "* * *
 {¶ 274} "Q. Okay. At the time you married Leticia, what did you have in terms of annuities and life insurance? *Page 23 
 {¶ 275} "A. I do not remember because it has been rolled over, rolled over, I think it was Capital or Lincoln, the only ones I remember are the present one in the last ten years, which was transferred to USG and I think it's Lincoln.
 {¶ 276} "Q. I'm going to hand you what's marked as Defendant's Exhibit "OO", is that the document that you prepared?
 {¶ 277} "A. Yes, maam.
 {¶ 278} "Q. Okay. Does that list contract numbers for prior annuities that you had?
 {¶ 279} "A. Yes, as far as I could get it, that's why I can't even put the amount in the New England and Capital because I don't remember.
 {¶ 280} "Q. At the time, since you were married to Leticia, have you withdrawn any monies from the annuities that you owned at the time of the marriage?
 {¶ 281} "A. No, I have not withdrawn any, except the roll overs, you know.
 {¶ 282} "Q. Well, but have you withdrawn any money — since you married Leticia have you added to any of those annuities that you had at the time?
 {¶ 283} "A. I don't' think I have, no.
 {¶ 284} "Q. Okay. Now, when the annuities matured, first of all the annuities were for a set term of years, correct?
 {¶ 285} "A. Yes, maam.
 {¶ 286} "Q. And so each annuity had a maturity date?
 {¶ 287} "A. Yes, maam.
 {¶ 288} "Q. Okay, what happened when an annuity would mature?
 {¶ 289} "A. Well, upon the advice of, advice of the financial advisor says we are going to get from this insurance a better retirement, why don't we do it. I accepted. *Page 24 
 {¶ 290} "Q. So that's what you were referring to as a roll over to another —
 {¶ 291} "A. Yes, maam.
 {¶ 292} "Q. Okay, and when you rolled over the annuities did you take any cash out at that time?
 {¶ 293} "A. No, maam.
 {¶ 294} "Q. Okay, I'm going to show you what I've marked as Defendant's Exhibit "PP".
 {¶ 295} "A. Yes, Maam.
 {¶ 296} "Q. Okay, and can you tell me if that is part of an application for an annuity to the Equitable of Iowa?
 {¶ 297} "A. Yes, maam.
 {¶ 298} "Q. And that is a document that you signed when that document was first made?
 {¶ 299} "A. Yes, maam.
 {¶ 300} "Q. Okay, and the date of this is 1998?
 {¶ 301} "A. Yes.
 {¶ 302} "Q. Okay, now was this one of the roll overs that you —
 {¶ 303} "A. Yes, maam.
 {¶ 304} "Q. Okay, in the box that's number 6 on that form, is the box checked that says the policy applied for to replace or change any existing life insurance or annuity contract and the box is check marked, yes. Yes. Correct?
 {¶ 305} "A. Yes.
 {¶ 306} "Q. Okay. Who were the beneficiaries that were listed on that application? *Page 25 
 {¶ 307} "A. I have never changed my beneficiary from the start to my two children, Kim and Cheri.
 {¶ 308} "Q. So they are the ones that are listed?
 {¶ 309} "A. Yes, maam.
 {¶ 310} "Q. So Leticia was not named as a beneficiary on this policy?
 {¶ 311} "A. No, maam.
 {¶ 312} "Q. Was Leticia ever listed as the beneficiary of the annuities that you had at the time of your marriage?
 {¶ 313} "A. No, maam, because she always wants me to have everything separate because she claims she has also her own annuities."
 {¶ 314} Tr. at 389-391; 567-569
 {¶ 315} Upon review of the record, we find Appellant established by clear and convincing evidence the annuities remained separate property throughout the marriage.
 {¶ 316} The trial court found:
 {¶ 317} "H. The parties have life insurance and annuities. There is a Lincoln Life Insurance policy with a value of $156,773; an ING annuity with a value of $254,346; a second ING annuity with a value of $93,684; and an AIG annuity in Wife's name with a value of $128,939. At one point, Wife had another annuity which was cashed in and became part of the balance in the Medina County Federal Credit Union.
 {¶ 318} "7. During the course of the trial there were allegations made on the part of Husband that some of the property in question was his separate property. He spoke of rolling over proceeds from prior residences, prior insurance policies and prior annuities. There was no documentary evidence to support this contention that any of *Page 26 
the assets were separate property and his testimony was not sufficient to convince the Court a finding of separate property should be made."
 {¶ 319} The trial court can find an asset remained separate property without documentary evidence. Upon review of the record, Appellant introduced clear and convincing evidence the policies remained separate property and were not added to or withdrawn from; rather, the policies matured, rolled over and accumulated. We overrule the assignment of error with regard to the real property, but reverse the trial court's determination with respect to the annuities and life insurance.
 IV. {¶ 320} In the fourth assignment of error, Appellant asserts the trial court erred in the division of Appellant's pension. Specifically, Appellant argues the trial court failed to consider the pension evaluators report valuing the survivorship portion of the pension in favor of Appellee. Appellant cites the second evaluator's report dated June 2, 2006 setting a value on Appellee's survivorship portion and stating the same can be considered a "pre-existing payment already made to the non-participant by the participant from separate property as a result of the survivorship election." Appellant maintains the present value of the pension should be divided equally as marital property and then the survivorship election should be subtracted.
 {¶ 321} At trial, the following exchange occurred with regard to Appellant's pension:
 {¶ 322} "Q. All right. All right, let's go to, now you have a pension —
 {¶ 323} "By Ms. Smithern: Are we stipulating to the pension report by QDRO Consultants? *Page 27 
 {¶ 324} "By Ms. Perlman: We can stipulate that that's what they say, but it does not take into account Mrs. Banez's portion that she receives if Mr., if Doctor Banez predeceases her.
 {¶ 325} "By Ms. Smithern: So do I need to call QDRO Consultants to get a fair market value of the marital portion versus the separate portion?
 {¶ 326} "By Ms. Perlman: What I'm saying is, that when Dr. Banez retired he made the election that everybody needs to make whether to take, I think they call it a single wife calculation or the calculation where the spouse receives a lesser amount if the husband dies first which in this case is $1730.00 —
 {¶ 327} "A. As of 2004.
 {¶ 328} "By Ms. Perlman: — per year —
 {¶ 329} "A. — received a letter from the Federal Government that because of my contributions that I allowed them to deduct from my pension should I die she's going to receive for the rest of her life, at that time the amount of $1,720.00 a month.
 {¶ 330} "By Ms. Smithern: Right. So what is your point?
 {¶ 331} "By Ms. Perlman: I don't' believe — so I don't believe that the QDRO Consultants report —
 {¶ 332} "By Ms. Smithern: But he's alive, so he's alive, so we take the current fair market value.
 {¶ 333} "By Ms. Perlman: Except that she has the rights, she ahs [sic] a vested interest in receiving —
 {¶ 334} "By Ms. Smithern: So if we — I mean, are we stipulating to do a Qualified Domestic Relations Order to divide the marital portion of the benefit? *Page 28 
 {¶ 335} "By Ms. Perlman: I'm saying that that is not necessarily the total marital portion — I mean I agree with the percentages, percentages you know, of time, but Mrs. Banez has a vested interest in receiving a certain amount of money from the, from the pension if Dr. Banez dies first, and I don't believe that that interest, which my understanding is that was an irrevocable election and that cannot be changed, whether that interest has been evaluated.
 {¶ 336} "By Ms. Smithern: Okay, so did you engage QDRO Consultants or another expert to value what you believe that additional component to be?
 {¶ 337} "By Ms. Perlman: I didn't, but you're the one that is offering this as a total value of the — and what I'm saying is that there's an additional amount that has not been evaluated.
 {¶ 338} "Ms. Smithern: Well then I'll just claim 100% of it is marital property and then you'll have the burden of proving what is the separate property component, I mean, this ridiculous — can we go off the record?
 {¶ 339} "By the Court: We can.
 {¶ 340} (Tape resumes as follows);
 {¶ 341} "By the Court: All right, we're back on the record.
 {¶ 342} "Q. So I would offer "18B1" which is the pension evaluation report prepared by QDRO Consultants which indicates that as of November 18, 2005, the fair market value of Mr. Banez's civil service retirement system plan is $279,767.00 and likewise because part of the pension was earned prior to the marriage it reduced the marital portion to $152,069.81"
 {¶ 343} Tr. at 398-401. *Page 29 
 {¶ 344} In making its determination of the parties' income, the trial court found:
 {¶ 345} "8. Ohio Revised Code Section 3105.18(C)(1) indicates that spousal support must be both appropriate and reasonable and lists certain factors that the Court must consider in determining spousal support. A discussion follows:
 {¶ 346} "A. Income of the parties from all sources. Husband's gross monthly benefit from his Civil Service pension is $2,877. However, 54.36% of that pension is marital. When the pension is divided equally by QDRO, Wife will be receiving 27.18% of the $2,877 each month, or $782. Husband will be receiving 71.22% of the monthly benefit or approximately $2,049. Based on his 2005 Federal Income Tax return, Husband receives gross Social Security of $10,994 per year. Wife receives Social Security of $5,138 per year. Therefore, Wife's gross monthly income will be $782 from Husband's pension and $428 from her Social Security or $1,210 per month. Husband will be receiving $2,049 from his pension and $916 per month from Social Security or $2,965 per month. The total monthly income of the parties is $1,210 plus $2,965 or $4,175. Half of that amount is $2,088. In order for Wife to have the monthly of $2,088, Husband would have to transfer $878 per month to Wife tax free. In addition to Social Security and pension, the parties will have income from their IRAs. They are of an age where at least minimum distributions are mandatory and they can withdraw more than the minimum. They also have savings which will generate some income."
 {¶ 347} We note Appellant's counsel stated the previous election by Dr. Banez to provide survivorship benefits to Appellee was to herunderstanding irrevocable. We do not know if a QDRO would supersede that election given that Appellee will no longer qualify as Appellant's surviving spouse. *Page 30 
 {¶ 348} Assuming Appellant's counsel's understanding is correct, both parties are currently proportionally receiving less under the trial court's division of the current monthly payout status of the pension than they would have been had Appellant not elected to give Appellee survivorship benefits. Though Appellee potentially stands to benefit from an increased monthly payout amount if she survives Appellant, such potential is speculative in nature. We suspect Appellant's monthly payout may be increased if Appellee predeceases him. In any event, because of the speculation inherent in actuarial estimates of the survivorship benefit and the fact that the present payout amount is established and its division equitable, we find no abuse of discretion by the trial court in its division of Appellant's pension.
 {¶ 349} Appellant's fourth assignment of error is overruled.
 V. {¶ 350} In the fifth assignment of error, Appellant argues the trial court should have considered $30,000 in attorney fees the Court ordered Appellant to pay to Appellee in dividing the marital property.
 {¶ 351} In the trial court's findings of fact, the court specifically states husband's decision to contest grounds resulted in Appellee incurring additional fees, as did Appellant's lack of cooperation in discovery. Accordingly, the trial court acknowledges the attorney fees paid to Appellee, and declines to award Appellee additional fees. We find the trial court did not abuse its discretion in not including the fees paid as marital property, where the trial court previously ordered Appellant to pay the fees during the pendency of the case and given the trial court's stated reasons for their award.
 {¶ 352} The fifth assignment of error is overruled. *Page 31 
 VI. {¶ 353} In the sixth assignment of error, Appellant argues the trial court erred in awarding Appellee spousal support. Specifically, Appellant maintains the evidence established Appellee's income and available assets are sufficient to meet her needs; therefore, there has been no showing of need for spousal support for her sustenance and support.
 {¶ 354} R.C. Section 3105.18(B) states:
 {¶ 355} "(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 {¶ 356} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 357} "(b) The relative earning abilities of the parties;
 {¶ 358} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 359} "(d) The retirement benefits of the parties;
 {¶ 360} "(e) The duration of the marriage;
 {¶ 361} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 362} "(g) The standard of living of the parties established during the marriage; *Page 32 
 {¶ 363} "(h) The relative extent of education of the parties;
 {¶ 364} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 365} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 366} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 367} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 368} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 369} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 370} A trial court's decision concerning spousal support under R.C.3105.18 may only be altered if it constitutes an abuse of discretion. See Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67, 554 N.E.2d 83. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217. Furthermore, unlike the statute concerning property division, R.C.3105.18 does not require the lower court to make specific findings of fact regarding spousal support awards. While R .C. 3105.18(C)(1) does set forth fourteen factors the trial court must consider, if the court *Page 33 
does not specifically address each factor in its order, a reviewing court will presume each factor was considered, absent evidence to the contrary. Carroll v. Carroll, Delaware App. No. 2004-CAF-05035,2004-Ohio-6710, citing Watkins v. Watkins, Muskingum App. No. CT 2001-0066, 2002-Ohio-4237, (additional citations omitted).
 {¶ 371} Upon review of the record and the trial court's judgment, we find the trial court did not abuse its discretion relative to the spousal support award. The trial court specifically referenced its consideration of the factors outlined above, and a review of the record supports the amount and duration of the award.
 {¶ 372} The sixth assignment of error is overruled.
 {¶ 373} The June 26, 2006 Judgment Entry of the Stark County Court of Common Pleas, Domestic Relations Division, is affirmed, in part; reversed, in part; and remanded for further proceedings in accordance with the law and this opinion.
Hoffman, P.J., Farmer, J. concur;
 Edwards, J. concurs in part, dissents in part. *Page 35 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, The June 26, 2006 Judgment Entry of the Stark County Court of Common Pleas, Domestic Relations Division, is affirmed, in part; reversed, in part; and remanded for further proceedings in accordance with the law and this opinion. Costs assessed to Appellant. *Page 34